UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GENO BAKER,

      Plaintiff,

v.                         CASE No. 8:07-CV-1120-T-23TGW

CITY OF SAFETY HARBOR,
FLORIDA,

      Defendant.

_____

## REPORT AND RECOMMENDATION

The defendant has filed a Motion for Summary Judgment (Doc. 15) challenging the plaintiff's claims of racial discrimination under Title VII, the Florida Civil Rights Act ("FCRA"), and 42 U.S.C. 1981, and retaliation under Title VII and the FCRA. After referral, oral argument was conducted on the motion.

The defendant's motion should be granted as to the plaintiff's §1981 claim because this claim is not legally cognizable against a municipality. Further, I recommend that summary judgment be granted as to the plaintiff's race discrimination claim because the plaintiff's allegations are

either so de minimus that they do not constitute adverse employment actions,

or the plaintiff has failed to present evidence from which a factfinder could

reasonably conclude that the purported adverse actions were racially

motivated.

On the other hand, construing the convoluted record in the light

most favorable to the plaintiff, there are sufficient factual disputes at this

stage of the proceedings to allow the race harassment claim, and one of the

retaliation claims, to proceed to trial.  Accordingly, I recommend that the

defendant's Motion for Summary Judgment be granted in part, and denied in

part.

I.

A. The plaintiff Geno Baker has been employed in the defendant

City of Safety Harbor's public works department since 1995 (Doc. 14-2,

¶13).[1]  He is a utility maintenance level I employee in the water/wastewater

division, which is an entry-level laborer position (Doc. 14-2, ¶¶ 7, 13; Doc.

---

[1]The defendant's department of public works is comprised of four divisions: (1) water/wastewater; (2) sanitation/recycling; (3) streets/stormwater; and (4) fleet maintenance (Doc. 14-2, ¶6).

14-6, p. 1).[2] The plaintiff has been a level I employee longer than any other individual in the division.

Mica Huffman, the plaintiff's supervisor, has been the maintenance supervisor of the water/wastewater division for the city's public works department since 2000 (Doc. 14-2, ¶3; Doc. 14-5, ¶5). He determines job assignments and conducts employee evaluations, among other duties (Doc. 14-5, ¶4).

Since the plaintiff has worked for the defendant, he has consistently achieved an "exceeds expectations" rating on annual performance evaluations (Doc. 14-5, ¶10; see Doc. 14-9, pp. 1-23).[3] Further, he was selected as Outstanding Employee for Spring 2003(Doc. 14-3, p. 19). However, the plaintiff alleges that, beginning in 2003, his employment has been marred by racial discrimination and harassment within the defendant's public works department.

_____

[2]The plaintiff's position was originally titled "service worker I." It was changed to "utilities maintenance I" in 2003 (see Doc. 14-3, p. 5). The plaintiff's job description includes the performance of unskilled and semi-skilled manual labor related to the city's water and wastewater systems, including assistance in the installation, repair, and maintenance of meters, service lines, water mains, and other parts of the water and sewer distribution systems (Doc. 14-6, p. 1).

[3]Although the plaintiff has consistently received evaluations in the "exceeds expectations" category, he has also frequently had problems with attendance, which have negatively affected his evaluation scores (see Docs. 14-7, 14-8, 14-9).

The plaintiff alleges that in 2003 and 2004 Huffman assigned him to "shit" job assignments because he is black (Doc. 16, p. 101; Doc. 23, p. 66).[4]   For example, in February 2003, the plaintiff testified that he and Willie Fred Brooks, another black employee, were assigned to remove a tree from a sewer main because the white employees refused to do it (Doc. 18, pp. 218-20;   Doc. 23, pp. 39-45).   The plaintiff stated that if he had had the assistance of the higher level white employees who are authorized to operate heavy equipment, the job could have easily been completed; instead, the plaintiff and Brooks were given a shovel, axe, and a borrowed chainsaw to perform the assignment (see Doc. 18, p. 219; Doc. 23, pp. 40-41).

The plaintiff also complains that, in 2003, he and Brooks were assigned to perform numerous sewer cleanouts in homes when white employees refused to complete the work (Doc. 18, pp. 224-25).   Brooks testified further that Baker was assigned more often than anyone else jobs including "lots of serious cleaning," jobs requiring the "busting out [of] sidewalk[s]," and "[d]igging some serious tree roots" (Doc. 23, p. 66).

---

[4]With regard to depositions, page numbers refer to deposition pages, not the page number assigned when the document was filed in CM/ECF.

The plaintiff complained to Huffman's superiors about his job assignments (see Doc. 16, p. 101). In a grievance dated September 30, 2003, the plaintiff complained that he was performing more work than other employees, and that he was being assigned work outside of his job description (i.e., performing level II work although he is a level I worker) (Doc. 14-3, pp. 21-23). The plaintiff also complained of harassment by his supervisors (id., p. 22).[5]

In addition, the plaintiff has filed grievances with the defendant regarding his rate of pay. On October 1, 2003, the city approved a pay plan which raised the minimum hourly rate for utility maintenance level I employees in the public works department to $9.94 (Doc. 14-2, p. 5, ¶21; Doc. 14-3, pp. 30-32). Consequently, individuals with less seniority than the plaintiff were receiving the same hourly rate as he was (Doc. 14-2, p. 5, ¶21).

---

[5] The plaintiff complained in that grievance that his vehicle was scratched and dented while parked at work (Doc. 14-3, p. 2; see also Doc. 17, pp. 165-69, 173). However, the plaintiff does not know who is responsible for this damage or how it happened (Doc. 17, pp. 169, 173). Consequently, even if the plaintiff's speculation that the damage occurred on city property is correct, he does not know if the damage was intentional, much less racially motivated (id., pp. 174, 178).

Furthermore, Joseph Boggs, a level I employee with less seniority than the plaintiff and others, was in a position to receive a higher hourly wage because Boggs's annual performance evaluation, and concomitant merit pay increase, was to take place before more senior employees (id.; Doc. 14-3, pp. 30-32; Doc. 20, pp. 100-03).[6] Bill Cropsey, the defendant's personnel director, stated that this "salary compression" had occurred in the past when minimum wages were increased, and it was ameliorated by a "pay adjustment" for the affected employees (Doc. 14-2, ¶22; Doc. 14-3, pp. 30-31; Doc. 20, pp. 99-103). Accordingly, in order to avoid the pay disparity, the hourly wages of the plaintiff, Brooks, and Scott Savoia, utility maintenance level I employees in the water/wastewater division who had more seniority than Boggs, were increased in November 2003 to correspond with Boggs's annual merit increase (Doc. 14-2, ¶22; Doc. 14-3, p. 30; Doc. 20, pp. 102-03).

Believing that Savoia and Boggs received these wage increases for personal reasons, the plaintiff submitted a grievance to the defendant, dated January 13, 2004, alleging that Savoia's and Boggs's rate increases

---

[6]The evaluation date is based on the employee's hire date (Doc. 20, p. 101). It previously was conducted on the calendar date six months following the hire date (id.).

were discriminatory (Doc. 20-4, pp. 6-7). The plaintiff also alleged that it was discrimination to give white employees with less seniority the same hourly wage as he received, although the plaintiff specified that he did not grieve the increase in the minimum wage (id.). The plaintiff also does not claim that the defendant failed to give him a raise to which he was entitled (Doc. 19, p. 295).

As indicated, the plaintiff is in the unique position of being a level I employee longer than any other individual in the division. Other than submitting an application for a promotion in 2004, which he subsequently withdrew, the plaintiff has not applied for a promotion since 2000 (Doc. 16, pp. 48, 52-53). The plaintiff contends that, instead of applying for a promotion, which requires a written examination, he should have been "reclassified" from a level I to a level II position (see Doc. 17, pp. 145-46; Doc. 14-2, p. 2, ¶¶ 8, 9, 10). A reclassification occurs when a position is redesignated as a higher level position, and the lower position is eliminated (Doc. 14-2, p. 2, ¶11). Reclassification depends upon the city's budget and needs of the departments (id.). For example, in 2002 and 2003, the defendant "reclassified" level II service workers Lenny Degroat and John Byrd as level

-7-

III workers (id., ¶12). The defendant, however, has never reclassified a level I position to a higher level (id., ¶11).

In another grievance dated January 13, 2004, the plaintiff alleged that he was "denied the opportunity to collect differential pay" (Doc. 19-4, p. 1). In this regard, the plaintiff complained about performing level II work without a commensurate pay increase (id.). Although the plaintiff agrees that level II work is easier and less labor intensive than level I work, he objects to performing work that is purportedly outside his duties (Doc. 16, pp. 60-61; Doc. 18, p. 257). The defendant, however, does not have a differential pay policy (Doc. 20, p. 10). Further, the plaintiff cannot identify any employee who has received differential pay even though white and black employees regularly work outside their job descriptions (Doc. 17, pp. 162, 165; Doc. 18, pp. 232-33).

In addition to disparate work assignments and pay, the plaintiff alleges racial hostility and harassment in the defendant's public works department, which he contends that management has not remediated. In the winter of 2004, black employees Todd Barber and Brooks stated that white co-workers Glenn Goss and Boggs made ape-like gestures and monkey noises

-8-

in their direction at a job site (Doc. 23, pp. 58-59; Doc. 25, pp. 27-28). Barber stated that he told three supervisors about the incident, but no disciplinary action was taken (Doc. 25, p. 29).[7]

In March 2004, Barber and John Crayton, another black employee, met with Wayne Logan, then city manager, concerning race problems in public works (Doc. 22, pp. 14-16; Doc. 22-2, p. 1). Although Logan believed that there was a race problem, Logan did not interview or investigate anyone (see Doc. 22, pp. 29, 39). Logan allegedly refused to take action against the responsible parties because they had done a good job for him (Doc. 25, p. 26).

In April 2004, a black and yellow stuffed monkey was placed by the door of the truck to which the plaintiff and Brooks were assigned (Doc. 16, pp. 65-66). White employees were allegedly snickering and laughing (Doc. 23, pp. 10-11; Doc. 25, pp. 24, 33). Huffman threw the monkey in the

---

[7]At about that time, there was a verbal altercation at the public works department between Willie Dollard, a black employee, and Goss, after Goss purportedly perceived that Dollard made a disparaging comment about his weight (Doc. 25, pp. 36-37). The plaintiff has not presented admissible evidence that this incident was prompted by race. Although Cropsey stated that he heard "the n word" was said during that altercation, his testimony on this point is hearsay (see Doc. 20, pp. 34, 77-78).

garbage, but it was allegedly taken out of the garbage (Doc. 25, p. 24). After this incident, the white and black employees stopped speaking with each other for a few days, and there was a lot of tension (id., pp. 24-25).

On April 19, 2004, the plaintiff prepared an e-mail to Wayne Logan which complained of racism in the department and an inadequate response by management to these problems (Doc. 22-2, p. 11). In particular, the plaintiff characterized the monkey noises as a "display of racism" and stated that the monkey incident was "very offensive" (id.). He alleged further that, by failing to take disciplinary action, management has condoned the racist conduct (id.).

As a result of prior racial discord, Logan had met with the supervisors and employees in the public works department to inform them that racial comments and gestures would not be tolerated  (Doc. 22, pp. 50-55). Further, a new administrative policy was issued precluding harassment based on race (Doc. 14-2, ¶23; Doc. 14-3, pp. 34-35). All employees in the department were also required to attend diversity training (Doc. 14-2, ¶24).

The plaintiff claims that he subsequently saw the same yellow and black monkey that was previously placed beside his truck on the

dashboard of a city sanitation truck assigned to Gil Gilpin, who is white, and temporary employee Dwight Byers, who is black (Doc. 16, pp. 77-81). The plaintiff stated that, "as an African-American, I took it very personally. I complained about it once [before]" (id., pp. 80-81). Despite the plaintiff's complaint to management the monkey allegedly remained in the truck for three weeks (id., pp. 83-84). An investigation revealed that Byers placed the monkey on the dashboard (Doc. 14-2, p. 6, ¶25). Since Byers is black, Cropsey believed there was an absence of racist intent and, therefore, no one was disciplined (id.).

On December 3, 2004, there was an altercation between the plaintiff and co-worker Goss in the breakroom of the public works department (Doc. 14-2, p. 7, ¶26). Goss, and Richard Burke, who allegedly witnessed the incident, alleged that the plaintiff repeatedly yelled at Goss in a threatening manner that he was going to "Fuck [him] up" (id.; see Doc. 14-3, pp. 37-38). The plaintiff denies speaking to Goss (Doc. 17, pp. 186, 187).

Goss and Burke telephoned the Pinellas County Sheriff's Department, which took statements (Doc. 14-2, p. 7, ¶26; Doc. 14-3, pp. 37-38). Additionally, Goss, Burke, and several other employees submitted to

-11-

Cropsey statements which detailed a pattern of erratic and troubling conduct by the plaintiff leading up to this incident  (Doc. 14-2, p. 7, ¶¶ 27, 28; Doc. 14-4, pp. 1-13).   The statements included allegations that the plaintiff threatened to "Fuck this place up" and "go postal," and that the plaintiff expressed rage to the point that employees were fearful of him (see Doc. 14-4, pp. 1-13).

Consequently, based on his concerns for workplace safety, Cropsey decided to place the plaintiff on administrative leave with pay and refer him for a fitness-for-duty evaluation (Doc. 14-2, pp. 7-8,  ¶¶ 30, 41; Doc. 14-4, p. 14).   Dr. Ashok M. Patel at Florida Behavioral Medicine recommended that the plaintiff remain on leave for six weeks pending behavioral and personality testing (Doc. 14-2, p. 8, ¶32; Doc. 14-4, p. 17).

On December 8, 2004, the plaintiff filed with the Equal Employment Opportunity Commission ("EEOC") a charge of race discrimination against the defendant.

In January 2005, the plaintiff's evaluation was completed, and Dr. Patel concluded that, although the plaintiff was still "significantly distorting some aspects of his work situation," there was insufficient evidence

-12-

that he posed a threat to the workplace (Doc. 14-4, p. 27). Dr. Patel therefore recommended that the plaintiff return to work on a part-time basis for a period of two weeks before resuming full-time work, and that the plaintiff be assigned a co-worker with whom he could speak in the event of problems (id., p. 29). Cropsey directed the plaintiff to meet with him on January 24, 2005, at which time he was permitted to return to work. Tommy Lewis, a co-worker, was assigned to work with him (Doc. 14-2, ¶39; Doc. 14-4, p. 30).[8] The plaintiff did not lose any pay or benefits during his time on administrative leave, and he was not disciplined for his altercation with Goss (Doc. 14-2, p. 10, ¶40; Doc. 18, pp. 207-08).[9]

When the plaintiff returned from administrative leave, the defendant allegedly would not assign him work with Boggs or Goss, the two white employees with whom he had disputes (Doc. 25, p. 18). Burke, Boggs, and Goss reportedly told Barber they did not want to work with the plaintiff

---

[8]Prior to meeting with Cropsey on January 24, 2005, the plaintiff attempted to return to work on January 21, 2005. Huffman, the plaintiff's supervisor, had not been informed that the plaintiff was permitted to return to work and, therefore, directed the plaintiff to leave the workplace (Doc. 14-2, p. 9, ¶38; Doc. 18, pp. 203-06; Doc. 21, pp. 40-41; see also Doc 20-2, p. 17).

[9]Goss was sent to anger management classes on his personal time because Cropsey believed that he could have handled the incident better (Doc. 20, p. 40).

(id., p. 17). Further, Huffman allegedly did not tell the plaintiff his job assignments or make eye contact with him (see Doc. 36, pp. 11-14). When Lewis attempted to get the plaintiff and Huffman together and shake hands, Huffman hesitated and later told Lewis that the handshake was "bullshit" (id., pp. 60-61). Moreover, in February 2005, the plaintiff received for his 2004-05 annual evaluation a score of 46 points, his lowest evaluation since being employed by the defendant (Doc. 19-2, pp. 18-19).[10]

In March 2005, the plaintiff and white co-worker Brian Edwards requested weight belts for back support (Doc. 14-5, pp. 4-5, ¶20). Although a weight belt was purchased for the plaintiff, he refused to wear it because it had shoulder straps, and he had requested a weight belt without shoulder straps (id.; Doc. 18, pp. 234-35). Soon thereafter, the defendant stopped furnishing weight belts because they were offering a false sense of security among workers, thereby increasing the risk of injury (Doc. 14-5, p. 5, ¶20).

---

[10]On the performance evaluations, employees are given zero to four points in fifteen work categories. An employee with 55 points or higher is awarded a merit increase of 5%, a score of 50-54 points results in a 4.5% increase, and 45-49 points results in an increase of 4% (see Doc. 14-9, pp. 1-2). Since joining the water/wastewater division, the plaintiff has typically received scores of 50-54, which affords a merit increase of 4.5% (see id., pp. 1-23).

In a grievance dated July 31, 2006, the plaintiff alleged that Huffman provided him a shovel in poor condition to replace a water meter and that he was refused city-issued Gatorade (Doc. 14-4, pp. 31-33; see also Doc. 18, pp. 243-44, 278-79). Huffman denies the plaintiff's allegations (Doc. 14-5, pp. 5-6, ¶¶ 21-24; Doc. 14-11, pp. 1-2). The grievance was resolved by having the plaintiff make such requests to Barber, the utilities foreman (Doc. 14-2, p. 11, ¶47; Doc. 14-4, p. 34).[11]

On about September 8, 2006, Boggs complained that the plaintiff made monkey noises in his direction while they were on a work break in a convenience store (see Doc. 17, pp. 179, 183; Doc. 19-4, p. 7). The plaintiff denied the allegations, and he believes that Boggs should have been disciplined for making a false statement about him (Doc. 17, pp. 179, 184-85). Cropsey stated that the complaint was ridiculous, and he declined to discipline anyone, as it occurred off city property during break time (Doc. 20, pp. 67-68).

---

[11]The plaintiff has also complained that he was not permitted to take home his Nextel 2-way radio until 2006 (Doc. 18, p. 261). The plaintiff, however, never requested permission to take it home and, although he has been affirmatively told he may take it home, he chooses not to do so (Doc. 18, pp. 263, 267; Doc. 21, p. 30).

-15-

B.  As indicated, the plaintiff filed a charge of discrimination against the defendant on December 8, 2004, alleging race discrimination and retaliation in violation of Title VII and the FCRA (Doc. 2, pp. 11-12). Among other things, the plaintiff specifically alleged that black employees had been harassed and intimidated, and that they were subject to disparate treatment in terms of job assignments and pay.

In April 2006, the EEOC issued a Letter of Determination, finding that there was reasonable cause to believe that a violation of Title VII occurred (Doc. 38-2, pp. 1-2).[12] It concluded, among other things, that the plaintiff "was subjected to racial innuendos and harassment (racial slurs, stuffed monkeys on [the defendant's] property and in their trucks)" and that "blacks as a class have been subjected to racial harassment, disparate treatment, intimidation and threatened with termination because of their race" (id.).  The matter was referred to the U.S. Department of Justice, which, in Spring 2007, declined to file a lawsuit on the plaintiff's charge of discrimination and issued the plaintiff a right to sue letter (Doc. 2, p. 13).

---

[12]The defendant disputes the thoroughness of the investigation underlying the EEOC's findings (see Doc. 15, p. 15 n. 1).

The plaintiff subsequently filed this lawsuit against the defendant alleging race discrimination, race harassment and retaliation in violation of Title VII and the FCRA, and race discrimination in violation of 42 U.S.C. 1981 (Doc. 2).[13] The defendant has filed a motion for summary judgment on all of the plaintiff's claims (Doc. 15). The motion for summary judgment was referred to me for disposition if it was to be denied, or for a report and recommendation if it was to be granted (Doc. 26).

The plaintiff's opposition memorandum contains a barrage of claims (Doc. 30). The plaintiff indiscriminately alleges as unlawful seemingly every complaint he has had in recent years concerning his employment with the defendant, as well as the complaints of other employees. Compounding this problem, it was unclear (among other things) which actions comprised each of his claims, and what evidence supported his contentions that these acts were unlawful.[14]

---

[13]The lawsuit was filed by the plaintiff in state court and then removed to federal court by the defendant (Doc. 1).

[14]The argument section of his opposition memorandum does not contain one citation to the record (see Doc. 30, pp. 17-20).

-17-

Oral argument was held on the motion, but it did not clarify the situation. Consequently, in order to permit a proper evaluation of the claims, the plaintiff was directed to submit a list with the following information (Doc. 58):

> A. With regard to the race discrimination claim, state with particularity each alleged adverse employment action, including the dates and the decisionmaker(s) involved in each action; and provide citations to the record which support the contention that the challenged action was an adverse employment action;

> B. With regard to the retaliation claim, state with particularity each alleged adverse employment action that was made in retaliation for protected activity, including the dates of each challenged employment action; the dates of the protected activity; identify the decisionmaker(s) involved in each of the challenged employment actions; and provide citations to the record that support the contention that each challenged employment action was in retaliation for the protected activity; and

> C. With regard to the race harassment claim, state every act that comprises this claim; identify (to the extent known) the alleged harassers; and the date of each alleged act of harassment.

The Order further advised the plaintiff "that any employment actions that are not identified in the list, as well as any listed employment

-18-

actions for which these requirements are not satisfied, will be deemed abandoned" (id.).

## II.

The court shall enter summary judgment only if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R.Civ.P. 56( c). Material facts are those over which disputes "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The movant bears the burden of establishing the absence of a dispute over material facts. Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 469 (11th Cir. 1993).

Where the party opposing the summary judgment motion has the burden of proof at trial, the moving party may discharge its initial burden by identifying specific portions of the record which show the absence of evidence to prove the nonmoving party's case at trial. United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437-38 (11th Cir. 1991).

-19-

Alternatively, the movant may come forward with "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." Id. at 1438. If the moving party does not meet its burden, then the motion for summary judgment will be denied. Id. at 1437.

Where the moving party meets its initial burden, the burden then shifts "to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). If the party opposing the motion is unable to make a sufficient showing on an element essential to its case on which it has the burden of proof at trial, the movant is entitled to summary judgment. United States v. Four Parcels of Real Property, supra, 941 F.2d at 1438.

In determining whether the moving party should be awarded summary judgment, the court must view the evidence and factual inferences therefrom in the light most favorable to the opposing party. Reynolds v. Bridgestone/Firestone, Inc., supra, 989 F.2d at 469. Any reasonable doubts about the facts are to be resolved in favor of the party opposing the motion for summary judgment. Id.

Although the plaintiff argues that the EEOC determination is "highly probative" evidence of discrimination, and even suggests that it is a basis for denying the summary judgment motion (Doc. 30, p. 16), the plaintiff has not cited any Eleventh Circuit case which relieves him of his responsibility to satisfy the summary judgment burden articulated in Clark v. Coats & Clark, Inc., supra, and other cases. Moreover, the Eleventh Circuit has noted that "EEOC reports ... vary greatly in quality and factual detail," and therefore, the EEOC's finding may not even be admissible at trial if its probative value is outweighed by the danger of creating unfair prejudice in the minds of a jury. Barfield v. Orange County, 911 F.2d 644, 650 (11th Cir. 1990), cert. denied, 500 U.S. 94 (1991).[15]

### III.

The plaintiff has complained about numerous incidents at work, many of which clearly do not support claims of employment discrimination or retaliation. At the hearing, I made clear to plaintiff's counsel not only that she had failed to present the claims in an organized fashion, but that a number

---

[15]The quality of the EEOC's investigation in this case is unknown and the EEOC's finding of discrimination is conclusory.

-21-

of the claims are clearly meritless. In the hope that plaintiff's counsel would reevaluate the numerous claims that had been asserted, and weed out the bad ones, she was directed to particularize the claims in a list, and to set forth the evidence supporting each one. My hope for a winnowing of the claims was unfulfilled. Plaintiff's counsel continues to press a number of frivolous claims. As a result, the court has wasted a great deal of time on this matter. Consequently, plaintiff's counsel is cautioned that such conduct, if repeated, could result in sanctions pursuant to Rule 11(c)(3), F.R.Civ.P.

In all events, the plaintiff, having submitted a list of twelve pages of purported unlawful conduct (Doc. 59), has abandoned any other contentions raised in prior court documents or by the evidence (id.). Moreover, the Order (Doc. 58) also directed the plaintiff to state the evidence supporting each of his contentions. Therefore, for the purposes of the summary judgment motion, the plaintiff should be limited to relying upon the evidence cited in his supplement.

## IV.

Initially, the defendant contends that the plaintiff is procedurally barred from litigating: "(1) the [alleged discriminatory] job assignments in

-22-

2003; (2) Plaintiff's 2003 grievance [that he was assigned more work than others and work outside his job description]; (3) the reclassifications [of employees to higher level positions] in 2002 and 2003; and (4) implementation of the new pay plan in 2003" (Doc. 15, pp. 17-18). The defendant argues that these acts are barred because the plaintiff did not include them in his charge of discrimination (id.). Alternatively, the defendant contends that these acts are barred by the statute of limitations because the plaintiff's charge of discrimination was filed more than 365 days after each occurrence (id., p. 18).

Alleged violations of the FCRA must be asserted in a charge of discrimination with an administrative agency within 365 days of the occurrence. Fla. Stat., §760.11(1).[16] A plaintiff is authorized to file a lawsuit alleging employment discrimination within 90 days of receiving a right to sue letter from the administrative agency. See 42 U.S.C. 2000e-5(f)(1). The judicial complaint may include allegations specified in the charge of discrimination, as well as claims that could "reasonably be expected to grow

---

[16]Title VII provides that, in this circumstance, the allegations must be asserted within 300 days of the unlawful conduct. 42 U.S.C. 2000e-5(e)(1).

out of the charge of discrimination." <u>Gregory</u> v. <u>Georgia Dept. of Human Resources</u>, 355 F.3d 1277, 1280 (11th Cir. 2004). A claim can be reasonably expected to grow out of the discrimination charge if it is "like, or related to...the allegations contained in [the] EEOC charge." <u>Id</u>.

The EEOC charge in this case alleges claims of disparate job assignments and disparate pay (Doc. 2, pp. 11-12). The plaintiff's contentions regarding (1) the alleged discriminatory job assignments in 2003; (2) the plaintiff's 2003 grievance that he was assigned more work than others and work outside his job description; (3) the reclassifications of employees to higher level positions in 2002 and 2003; and (4) implementation of the new pay plan in 2003 (Doc. 15, pp. 17-18) are reasonably related to the allegations of disparate job assignments and disparate pay asserted in the charge of discrimination. Therefore, these contentions could have reasonably been expected to grow out of the charge of discrimination. <u>Gregory</u> v. <u>Georgia Dept. of Human Resources</u>, <u>supra</u>, 355 F.3d at 1280.

The defendant argues that they are not reasonably encompassed within the charge of discrimination because they occurred prior to March 2004, which is identified as the earliest date of discrimination in the charge's

"date(s) discrimination took place" box   (Doc. 15, p. 18).   However, the defendant has not cited any legal authority that precludes consideration of conduct outside the dates identified in that box if they are related to the allegations made in the charge of discrimination.   Moreover, the Eleventh Circuit has cautioned against strict interpretation of a discrimination charge. See Sanchez v. Standard Brands, Inc., 431 F.2d 455, 463 (5th Cir. 1970).[17] Therefore, the defendant has presently failed to show that consideration of these contentions is barred for failure to assert them in a charge of discrimination.

The defendant alternatively contends that alleged unlawful employment actions occurring in 2002 and 2003 are barred by the statute of limitations because they occurred more than 365 days prior to the plaintiff's December 2004 charge of discrimination (Doc. 15, p. 18).

This contention is unpersuasive with regard to conduct related to the race harassment claim, which falls within the statute of limitations exception for a "continuing violation." Watson v. Blue Circle, Inc., 324 F.3d

---

[17]Further, in an analogous context, the Eleventh Circuit has rejected attempts to limit charges of discrimination based on whether boxes on the charge of discrimination forms are "checked." See, e.g., Sanchez v. Standard Brands, Inc. supra, 431 F.2d at 463.

1252, 1258 (11th Cir. 2003).  Under the continuing violation exception, " as long as an act contributing to the hostile work environment claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." McCann v. Tillman, 526 F.3d 1370, 1379, n. 10 (11th Cir. 2008); Jones v. City of Lakeland, 2008 WL 2315872 at *4, n. 10 (11th Cir. 2008)(unpub. dec.)(the court "may consider incidents [of harassment] occurring outside the statutory time-frame because the very nature of the claim is one of repeated and pervasive conduct.").   The plaintiff has asserted in his charge of discrimination timely allegations of race harassment which, in conjunction with the allegations of disparate job assignments and inferior tools dating back to 2003, form his hostile work environment claim. Therefore, these contentions, although outside the statutory time frame, are not barred from consideration in this litigation.  See McCann v. Tillman, supra.

On the other hand, the implementation of the new pay plan in 2003, and the alleged discriminatory reclassifications of employees in 2002 and 2003, are barred by the statute of limitations because these are discrete acts for which a charge of discrimination was not filed within 365 days of the

occurrence. See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002)("discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges"); Smithers v. Wynne, 2008 WL 53245 at *1-*2 (11th Cir. 2008)(unpub. dec.). Thus, the December 8, 2004, charge is substantially more than one year after the implementation of the 2003 pay plan and the 2002-03 job reclassifications. Further, the plaintiff has not asserted any cogent legal argument that an exception to the statute of limitations applies to these discrete adverse employment actions (see Doc. 30, p. 17). In particular, the plaintiff does not assert that these actions are included within his claim of a hostile work environment.[18]

In sum, the defendant has failed to show that the allegations of disparate job assignments and the complaints asserted in the plaintiff's 2003 grievance are barred for failure to comply with administrative prerequisites. However, because the plaintiff's allegations of race discrimination based on

---

[18]Moreover, as discussed below, the plaintiff has not shown that he could prevail on the merits of these claims because he has not presented evidence from which a reasonable factfinder could conclude that a reclassification or the implementation of the 2003 pay plan was unlawful race discrimination.

job reclassifications in 2002 and 2003, and the 2003 new salary pay plan are barred by the statute of limitations, I recommend that these contentions be excluded from consideration in this litigation.

V.

The plaintiff has alleged disparate treatment in the terms and conditions of his employment because he is black. Where, as here, there is an absence of direct evidence, the plaintiff may establish a prima facie case of race discrimination by showing that: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; and (3) his employer treated similarly situated employees outside of his protected class more favorably than he was treated. See Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1323 (11th Cir. 2006).[19]

Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the challenged employment action. Id. The

---

[19]Claims of discrimination based upon Title VII and the FCRA are analyzed under the same principles. See Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1387 (11th Cir. 1998), cert. denied, 525 U.S. 1000 (1998); Jones v. City of Lakeland, supra, 2005 WL 2315872 at *4, n. 8. Accordingly, the focus of the analysis will be upon the Title VII claim.

-28-

defendant's burden is not one of persuasion; admissible evidence sufficient to raise a genuine issue of fact as to whether it had a legitimate reason for the employment decision is enough. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254-55 (1981). When such a reason is articulated, the presumption of discrimination is eliminated, and the plaintiff must submit significant probative evidence showing that the articulated reason is pretextual. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000); Burke-Fowler v. Orange County, Fla., supra, 447 F.3d at 1323.

The plaintiff has alleged eight discrete acts of race discrimination (Doc. 59, pp. 9-11). The allegations fail as a matter of law because the plaintiff has not established race discrimination as to any of them. In fact, the majority of them do not even constitute adverse employment actions.

Notably, not "all conduct by an employer negatively affecting an employee constitutes adverse employment action." Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001). Rather, the Eleventh Circuit has explained (id. at 1239)(emphasis in original):

> [T]o support a claim under Title VII's anti-discrimination clause, the employer's action must

-29-

> impact the "terms, conditions, or privileges" of the plaintiff's job in a real and demonstrable way. Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment. We therefore hold that, to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a <u>serious and material</u> change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

See also Butler v. Alabama Dep't of Transportation, __ F.3d __, 2008 WL 2901768 at *6 (11th Cir. 2008).

Under this standard, five of the eight listed acts of intentional discrimination do not constitute adverse employment action. Thus, no factfinder would reasonably conclude that any of the first five of the following claims caused a serious and material change in the conditions of the plaintiff's employment.

1.   Gatorade (Doc. 59, p. 11).

-30-

The plaintiff alleges that, on several occasions, Huffman refused to give him city-issued Gatorade, and was instead told to drink water to hydrate himself (Doc. 19, p. 278; Doc. 19-4, p. 25). The plaintiff filed a grievance regarding this matter in July 2006, and it was resolved a few weeks later when the plaintiff was told to request Gatorade from utilities foreman Barber (Doc. 19, pp. 278-79; Doc. 19-4, p. 28).

It is frivolous to contend that the denial of Gatorade is an adverse employment action. It is not, under any reasonable person's standards, a serious or material change in the terms and conditions of employment. While it may bolster the plaintiff's claim of a hostile work environment, it clearly does not rise to the level of an actionable incident of intentional employment discrimination.

2.    Weight Belt (Doc. 59, p. 11).

The plaintiff also alleges as a discrete act of race discrimination that he did not receive the type of weight belt he requested. The plaintiff wanted a weight belt without shoulder straps, and the defendant bought him one with straps, which he refused to wear (Doc. 18, pp. 233-34). The

-31-

plaintiff has failed to show that the defendant's failure to honor his personal preference for a weight belt without shoulder straps constitutes a serious and material change in the terms of his employment.  See Doe v. Dekalb County School Dist., 145 F.3d 1441, 1449 (11th Cir.1998)(the protections of Title VII simply do not extend to "'everything that makes an employee unhappy'").[20]

Furthermore, there is no probative evidence that the failure to honor the plaintiff's preference in weight belts was racially motivated. To the contrary, the same weight belt was purchased for white co-employee Edwards (Doc. 14-5, pp. 4-5, ¶20).

> 3.    Black Employees Could Not Take Nextel
>        Radio Home (Doc. 59, p. 11).

The plaintiff also alleges that, prior to 2006, white employees were permitted to take their Nextel radios home, but he was not (see Doc. 18, pp. 261-67).  The plaintiff's Nextel radio is a two-way radio, without a telephone, that is used by city employees to communicate with each other (id., pp. 261-62).

---

[20] It is noted that employees are not required to wear weight belts; to the contrary, soon after this dispute, the defendant stopped providing weight belts due to a concern that it gave employees a false sense of security (see Doc. 14-5, p. 5, ¶20).

This claim is also frivolous. The plaintiff was not denied use of the phone while working, and, because it is merely a walkie-talkie, its utility for home use has not been shown. Moreover, even if some home use were demonstrated, that would still fall short of showing that the home use was somehow related to the plaintiff's terms and conditions of employment. Underscoring the absurdity of this claim is that the plaintiff had never requested permission to take the radio home and, although he has now been told affirmatively that he can take the phone home, he chooses not to do so (Doc. 19, pp. 265-68). Therefore, this is not an adverse job action. <u>See</u> <u>Stavropoulos</u> v. <u>Firestone</u>, 361 F.3d 610, 617 (11th Cir.2004)("[A]n action which ... had no effect on an employee is not an 'adverse' action.").

        4.     Inadequate Equipment/Shovel (Doc. 59, p. 11).

The plaintiff complains that he was given inadequate equipment to do his job. The evidence the plaintiff cites in support of this claim is meager, and certainly does not show an adverse job action as that term is defined under the statute.

The plaintiff identifies an instance when Huffman offered him a shovel in poor condition to perform a meter replacement (Doc. 18, p. 243). However, this circumstance does not constitute a serious and material change in the terms and conditions of employment because the plaintiff himself testified that he successfully completed his assignment with the allegedly inferior shovel by merely bending the shovel tip back with a hammer (Doc. 18, pp. 249-50; see also Doc. 19-4, p. 23 (stating in a grievance that he successfully completed the task "with a little help from a hammer that I had to tap on top of the shovel.")).[21]

The plaintiff's only other specific references to inadequate equipment in this argument pertain to Brooks's vague testimony that he was not given a "Bobcat" machine to dig up asphalt and there were "a few times" when he and the plaintiff "dug holes deep with no ladder. No gloves" (Doc. 23, pp. 38-39). Brooks cannot recall any specific facts surrounding these

---

[21]It is noted that the defendant has alleged, in a footnote, that this conduct is allegedly not actionable because it occurred after the EEOC completed its investigation and was not the basis of a new charge (Doc. 53, p. 3 n. 8). It is not appropriate to consider this contention as part of the summary judgment motion because it was raised in a footnote of the defendant's reply, and there is no citation to supporting legal authority. However, this contention may be well-taken and could be a basis for subsequently excluding this evidence.

-34-

incidents (id., p. 39), and the plaintiff provides no testimony about them, either. The plaintiff, in particular, has not shown that the lack of a "Bobcat" pertains to his intentional discrimination claim, and he states that he could get gloves if he wanted them (Doc. 18, p. 246). Therefore, there is no basis to conclude that these incidents constituted a serious and material change in the terms and conditions of the plaintiff's employment. See Davis v. Town of Lake Park, Fla., supra, 245 F.3d at 1239 (although the statute does not require proof of direct economic consequences in all cases, the asserted impact "must at least have a tangible adverse effect on the plaintiff's employment.").

> 5.   White Employees Refusing to Do Work (Doc. 5, p. 9).

The plaintiff also alleges as race discrimination "[w]hite employees refusing to do work" (id., pp. 9-10). The evidence the plaintiff cites in support of this contention is meager as well (see id.).

In this connection, the plaintiff states that he was assigned to do sewer cleanouts and assist in the removal of a tree from a sewer main because white employees refused to do the work (Doc. 18, pp. 218-26). Although, as

discussed below, these circumstances may be considered as part of the plaintiff's racial harassment claim, they do not in themselves constitute discrete adverse job action. Thus, the plaintiff testified that these tasks were within his job description, that he knew how to accomplish them, and that he performed them successfully within his regular work hours (id., pp. 222-26). In sum, the plaintiff has failed to identify any material adversity resulting from these circumstances.[22] Furthermore, it is noted that the Eleventh Circuit has recently rejected a similar claim. See Butler v. Alabama Dep't of Transportation, supra, 2008 WL 2901768 at *2, *6 (rejecting the contention that being "forced to perform manual labor at job sites while ... a white co-worker was excused from doing the same work" was an adverse job action because her job included manual labor and the assignments were encompassed within her job description).

In sum, no reasonable jury could view the preceding five contentions as adverse job actions that may be redressed under Title VII or

---

[22]The plaintiff has not identified any adversity to him, but rather complains that the white employees should have been disciplined for insubordination (see Doc. 18. pp. 225-26).

the FCRA.  Therefore, the plaintiff should be precluded from asserting them as part of a disparate treatment claim.

With regard to the remaining three contentions, the plaintiff has failed to demonstrate disparate treatment because, among other things, the plaintiff has not presented evidence from which a factfinder could reasonably infer that the purported adverse actions were motivated by race.  See Chambless v. Louisiana Pacific Corp., 481 F.3d 1345, 1348 (11th Cir. 2007) ("a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome.").

> 6.    "City has immediate reaction to complaints
>        by whites but not blacks" (Doc. 59, p. 11).

This vague contention is ostensibly supported by comparing the defendant's handling of two of the plaintiff's grievances with those of two white employees (id.).  The plaintiff, in one example, compares the handling of Goss's December 2004 complaint that the plaintiff threatened to "Fuck [him] up" with the plaintiff's grievances regarding his pay and performing work outside his job description (id., ¶4; see Doc. 20-3, pp. 13-14; Doc. 20-4,

p. 6). The plaintiff, however, has failed to show how the alleged difference in responsiveness in this situation constituted a serious and material change in the terms and conditions of employment. Thus, the plaintiff has not demonstrated that these circumstances amounted to an adverse employment action. Furthermore, no inference of unlawful discrimination arises from a difference in responsiveness because, unlike the plaintiff's grievances, Goss's allegation involved possible danger to an employee's safety and, therefore, required an immediate response. See Jackson v. BellSouth Telecommunications, 372 F.3d 1250, 1273-74 (11th Cir. 2004)(different treatment of dissimilarly situated persons does not violate civil rights laws).

    The plaintiff's second example compares the handling of his July 2006 grievance that he received a bent shovel and was denied Gatorade, with Boggs's allegation that the plaintiff made monkey noises at him (Doc. 59, p. 11, ¶4). As already shown, the providing of a bent (but operable) shovel and the denial of Gatorade do not constitute adverse employment actions. Consequently, a failure to move swiftly with respect to such complaints would similarly not constitute an adverse employment action. In all events,

this contention is meritless because the white employee did not receive more favorable treatment in this circumstance. Thus, the record reflects that the defendant immediately began investigating the plaintiff's complaint, and that it was ultimately resolved in his favor within a few weeks (Doc. 19-4, pp. 25, 28; Doc. 19, pp. 278-79). In contrast, Boggs's complaint was not even resolved in Boggs's favor (see Doc. 20, pp. 66-68).

In sum, the incidents specified regarding alleged delayed responses to the plaintiff's complaints do not constitute serious and material changes in the terms and conditions of employment, and thus are not adverse employment actions. In addition, the plaintiff has failed to cite evidence from which an inference of race discrimination arises. Therefore, he has failed to state a disparate treatment claim based on the allegation that "City has immediate reaction to complaints by whites but not blacks" (Doc. 59, p. 11).

7.    Reclassification (Doc. 59, p. 10).

The plaintiff contends also that the defendant's failure to reclassify him as a level II employee, even though he was doing level II job

assignments, constitutes race discrimination (id.). This claim similarly lacks merit.

According to the defendant, reclassification occurs when a position is redesignated from one level to a higher level, and the lower level position is eliminated (Doc. 14-2, p. 2, ¶11; Doc. 20, p. 93). In this regard, the defendant states that, in 2002 and 2003, it reclassified two white level II employees to level III positions (Doc. 14-2, p. 3, ¶12; Doc. 20, p. 95). However, as discussed previously, the contention that these reclassifications were discriminatory is barred by the statute of limitations, as they were discrete actions that occurred more than one year before the plaintiff filed his EEOC complaint.

Furthermore, the plaintiff has not presented probative evidence from which a factfinder could reasonably conclude that the failure to reclassify the plaintiff was race discrimination. Thus, the plaintiff's personal opinion that he should be reclassified to a level II position because he can do level II work is not enough to establish a case of race discrimination. Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir. 1997). This is especially true in light of the defendant's unrefuted evidence that it has never

reclassified a level I employee, black or white, to a higher level (Doc. 14-2, p. 2, ¶11). Under these circumstances, the plaintiff cannot point to a white level I worker that was reclassified to a level II position. Accordingly, there is no similarly situated comparator upon which the plaintiff can base a claim of race discrimination. This circumstance (in addition to the statute of limitations bar) defeats the plaintiff's claim that the defendant's failure to reclassify him to a level II or higher position constituted race discrimination.

8.    "Salary issues" (Doc. 59, p. 10).

The plaintiff asserts that, in September 2003, "[w]hite employees with lesser seniority ma[d]e equal to or more than Baker" (id.). Further, the plaintiff alleges that Savoia and Boggs (white employees) unfairly received multiple raises in one year, which the plaintiff speculates were given for personal reasons (Doc. 19, pp. 279-80, 289-91). These contentions are baseless, as well as being barred by the statute of limitations.

As illustrated in the chart below, the record reflects that Boggs and Savoia received an hourly wage increase to $9.94, in October 2003, due to the city's pay plan increasing the minimum wage for level I employees

-41-

(Doc. 14-2, p. 5, ¶21; Doc. 14-3, pp. 30-32).[23] Furthermore, the plaintiff and Savoia received a "pay adjustment" the following month to compensate for a pay disparity that would have otherwise been created when Boggs, an employee with less seniority, received his annual merit increase (see Doc. 14-2, pp. 5-6, ¶¶ 21-22; Doc. 14-3, pp. 30-32; Doc. 20-4, p. 5). Subsequent raises were annual merit increases, and the plaintiff has not argued that the provision of an annual merit increase, given to all employees, is a discriminatory act.

| EFFECTIVE DATE | BAKER | BOGGS | SAVOIA |
|---|---|---|---|
| 01/19/03 | $9.95 (annual merit increase) (Doc. 19-3, p. 14) | | |
| 10/01/03 | | $9.94(increase in minimum wage) (Doc. 38-3, p. 7; Doc. 14-3, p. 30) | $9.94(increase in minimum wage) (Doc. 38-3, p. 11; Doc. 14-3, p. 30) |

[23]The plaintiff, obviously, did not receive an increase at that time because he was already making $9.95 hourly (see Doc. 14-3, p. 32).

| 11/12/03 | $10.45(pay adjustment) (Doc. 14-3, p. 33) | $10.44(annual merit increase) (Doc. 38-3, p. 6) | $10.44 (pay adjustment) (Doc. 14-2, ¶22; Doc. 14-3, pp. 30-31) |
| --- | --- | --- | --- |
| 1/19/04 | $10.92 (annual merit increase) (Doc. 19-3, p. 13) | | |
| 8/26/04 | | | $10.91 (annual merit increase) (Doc. 38-3, p. 10) |
| 11/12/04 | | $10.96 (annual merit increase) (Doc. 38-3, p. 5) | |

If the plaintiff thought the October or November 2003 pay adjustments were discriminatory, he was required to raise that contention in an administrative complaint within one year of the occurrence, which he did not do. Accordingly, an allegation that the October or November 2003 pay adjustments were discriminatory is barred by the statute of limitations.

Furthermore, the plaintiff has not established a case of intentional discrimination because there is nothing in these circumstances that

suggests disparate treatment.  Moreover, the plaintiff has not even attempted to refute the defendant's legitimate nondiscriminatory explanation for these wage increases.  See Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991).  Accordingly, the plaintiff's allegation concerning "salary issues" is not actionable.  And it is appropriate to add that the plaintiff's failure to make any meaningful argument on this contention underscores the plaintiff's lack of thought in his shotgun blast of allegations.

In sum, the plaintiff has not demonstrated an actionable claim of race discrimination as to any of the eight alleged racially discriminatory acts. I therefore recommend that the defendant be granted summary judgment in its favor on the plaintiff's race discrimination claim.

## VI.

The plaintiff also alleges that he was subjected to racial harassment in the workplace (Doc. 59, pp. 1-9).  Race harassment is commonly known as a hostile work environment.  See Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).  In contrast to a disparate treatment claim, which requires the identification of a discrete adverse job

action, a hostile work environment is "a series of separate acts ... [which] collectively constitute one unlawful employment practice." McCann v. Tillman, supra, 526 F.3d at 1378.

The plaintiff identifies twenty-five comments or incidents that he alleges, viewed collectively, created a racially hostile work environment (Doc. 59, pp. 1-9). As summarized below, many of these incidents should not be considered part of a racially hostile work environment claim because, to the extent that they even constitute harassment, the plaintiff has failed to present evidence that they were racially motivated. See Baldwin v. Blue Cross/Blue Shield of Alabama, 480 F.3d 1287, 1301-02 (11th Cir. 2007), cert. denied, 128 S.Ct. 499 (2007).   However, viewing the totality of the remaining incidents in the light most favorable to the plaintiff, there is arguably a factual dispute as to whether the plaintiff was subjected to a racially hostile work environment. I note that I am skeptical of this claim; however, in light of the convoluted record, I am not prepared to say at this stage of the litigation that judgment as a matter of law in the defendant's favor on this claim is appropriate.

In order to establish a racially hostile work environment claim, the plaintiff must show that (1) he has been subject to unwelcome harassment; (2) the harassment is based on his race; (3) the harassment is sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment; and (4) the employer is responsible for such environment under a theory of vicarious liability or direct liability. Miller v. Kenworth of Dothan, Inc., supra, 277 F.3d at 1275. The requirement that the harassment be severe or pervasive "tests the mettle of most ... harassment claims," and comprises an objective and subjective component. Reeves v. C.H. Robinson Worldwide, Inc., 525 F.3d 1139, 1145 (11th Cir. 2008). Thus, to be actionable, this behavior must result in both an environment that a reasonable person would find hostile or abusive, and an environment that the victim subjectively perceives to be abusive. Miller v. Kenworth of Dothan, Inc., supra, 277 F.3d at 1276.

Further, in evaluating whether the conduct created a discriminatorily abusive environment, the following must be considered: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive

-46-

utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. Id. The offensive conduct must be examined in context and collectively, with all reasonable inferences made in the plaintiff's favor. See id. at 1276.

On the other hand, "Title VII is not a federal civility code." Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999), cert. denied, 529 U.S. 1068 (2000). Thus, only when "the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment" is the law violated. Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)(internal citation and quotations omitted). Accordingly, "teasing, offhand comments, and isolated incidents (unless extreme) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775 (1998).

A. The plaintiff has presented evidence of a racially charged atmosphere in the workplace. In this respect, the plaintiff points out that twice a black and yellow stuffed monkey was placed in the workplace (Doc. 16, pp.

65-66, 77-81).[24] These incidents highlighted tension between white and black employees and they were racially offensive to the plaintiff (see, e.g., Doc. 22-2, p. 11; Doc. 25, pp. 24-25). Further, the second time the stuffed monkey appeared in the workplace, it allegedly remained on the dashboard of a sanitation truck for three weeks after the plaintiff complained to management (Doc. 16, pp. 83-84).[25] Although the placements of the monkeys alone would not establish a hostile work environment, since even a noose has been found not to be sufficiently severe to show such an environment, Barrow v. Georgia Pacific Corp., 144 Fed.Appx. 54, 2005 WL 1926420 (11th Cir. 2005)(unpub. dec.), the placements could be part of a pervasive atmosphere of racial hostility.

There is also evidence that two white employees, with whom the plaintiff worked, made monkey noises and monkey gestures at two black co-workers while at a job site (Doc. 23, pp. 58-59; Doc. 25, pp. 27-28). Although

---

[24]Although the plaintiff does not have a designated work truck, frequently employees know what truck they will be using the following day (Doc. 25, pp. 32-33; see also Doc. 23, p. 10).

[25]The defendant contends that the second monkey incident should not be considered as racist because a black employee placed the monkey in the truck. However, the plaintiff was not aware that a black employee had placed the monkey in the truck (Doc. 16, p. 80), and, therefore, he could have reasonably considered it to be a racist act.

the plaintiff did not observe this incident, he was made aware of it (see Doc. 22-2, p. 11). Therefore, it may be considered in determining whether the plaintiff perceived his working environment to be racially hostile. Jones v. City of Lakeland, supra, 2008 WL 2315872 at *4, n. 9 ("The court may consider racial slurs not directed at the plaintiff or not made in the plaintiff's presence as evidence of a hostile environment.")(citing Busby v. City of Orlando, 931 F.2d 764, 785 (11ᵗʰ Cir. 1991)).[26]

Significantly, there is evidence that, underlying these racial incidents, there was pervasive racial tension, exemplified by black and white employees sitting in separate areas during breaktime, a perception of black and white employees "taking sides," and, at times, limited communication between

_____

[26]The plaintiff has also cited evidence of other racial comments that are either inadmissible, or have not been shown to be probative of a racially hostile work environment (Doc. 59, p. 5, ¶¶ 12, 13). Accordingly, the comments should be excluded from trial. Thus, Crayton's testimony that he has heard black employees being referred to as "monkeys" in the fleet maintenance shop (Doc. 24, pp. 12-13) is not probative evidence because the plaintiff does not work in the fleet shop, and he has not cited to any evidence that he even knew about these comments. See Abbes v. Embraer Services, Inc., 2006 WL 2613753 at *4 (11ᵗʰ Cir. 2006)(unpub. dec.), cert. denied, 127 S.Ct. 1891 (2007)(the plaintiff cannot subjectively perceive a statement he is not privy to as hostile).

Further, Barber's testimony that Byrd told him that "a lot of employees" call them "niggers and monkeys" (Doc. 25, pp. 98, 99) is inadmissible hearsay. See Robinson v. LaFarge North America, Inc., 2007 WL 1748109 (11ᵗʰ Cir. 2007)(unpub. dec.). Moreover, the plaintiff has failed to show that Barber's testimony that Burke called the plaintiff, outside of his presence, a "nigger" at Barber's home, possibly ten years ago (Doc. 25, p. 97), is probative evidence of a hostile work environment.

black and white employees (Doc. 24, pp. 11-14, 17-18; Doc. 25, pp. 24-25, 36;
Doc. 33, pp. 11-12).  Furthermore, management agreed that there was a race
problem in its workplace (Doc. 22, p. 29; see also Doc. 20, pp. 80-81).

Compounding the problem, the plaintiff alleges that his
supervisor, Huffman, would assign him the "shit" job assignments that the
white employees refused to do and provided him with inferior tools (see Doc.
16, p. 101; Doc. 18, pp. 218-20, 224-25, 242-44; Doc. 23, pp. 39-40; Doc. 25,
pp. 57-59, 114).  Moreover, Huffman arguably harbored a racial animus, as
evidenced by his derogatory comments about the plaintiff coupled with
allegations that Huffman gave better assignments and equipment to white
employees (Doc. 19-4, p. 27; Doc. 36, pp. 39, 61).  The plaintiff complains
further that, at times, Huffman denied him Gatorade (see Doc. 14-4, p. 31;
Doc. 19, pp. 278-79).

There is ample evidence that the plaintiff subjectively believed
that he worked in a racially hostile environment.  Thus, the plaintiff's
grievances with the city, the results of his psychological examination, and the
plaintiff's testimony that he was offended by the racial incidents and that the
workplace has caused him physical illness, show that he subjectively

-50-

perceived his workplace to be racially hostile (see Doc. 14-3, pp. 21-22; Doc. 14-4, pp. 22-27, 31-33; Doc. 16, p. 81; Doc. 19, pp. 295-96; Doc. 19-2, pp. 7-8; Doc. 19-4, p. 1). Although the extent to which these circumstances have interfered with his job performance is unclear, "[h]arrassment need not be shown to be so extreme that it produces tangible effects on job performance in order to be actionable." See Miller v. Kenworth of Dothan, Inc., supra, 277 F.3d at 1277.

Furthermore, viewing the complicated evidence in the light most favorable to the plaintiff, it cannot be stated at this stage of the proceedings that an objectively reasonable person could not find the workplace to be a racially hostile or abusive environment. Although none of these incidents is severe, there are many alleged instances of racially motivated or offensive conduct that occurred over a substantial period of time. See Reeves v. C.H. Robinson Worldwide, Inc., supra, 525 F.3d at 1147 (noting that a hostile work environment may exist although "no single episode crosses the Title VII threshold"). Further, these circumstances, viewed cumulatively, do not necessarily fall into the category of the "ordinary tribulations of the workplace," see id., as there is evidence from both employees and

-51-

management of a tense racial atmosphere at the workplace, and at least one employee expressed concern that it might erupt into violence (see Doc. 24, pp. 11-12).

Finally, there is evidence showing that the defendant is arguably responsible for the purported racially hostile environment. Thus, Huffman's conduct is attributable to the defendant. Jones v. City of Lakeland, supra, 2008 WL 2315872 at *5. Further, it is undisputed that the plaintiff's supervisors and management, including the city manager, were aware of claims of racial harassment by co-workers. See Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir. 2000)(an employer may be liable for racially harassing conduct of co-workers for which it has actual or constructive knowledge). Moreover, although the defendant did take remedial action, there is a factual issue as to its adequacy, as there are allegations of continuing racial hostility and that some complaints were not resolved promptly or adequately (see, e.g., Doc. 16, pp. 81-83; Doc. 19, pp. 275-76, 278; Doc. 24, pp. 9, 12, 15; Doc. 25, pp. 25-26, 29).

In sum, the ambiguous record appears to reflect sufficient factual issues that preclude summary judgment in the defendant's favor on the race

-52-

harassment claim. The presentation of the facts by the parties leaves it unclear about the frequency and timing of racial incidents, so that it is difficult to discern whether they amount to pervasive harassment. Both employees and members of management appear to agree that the workplace was charged with racial tension, but the specific incidents that led to that tension have not been clearly shown. Frankly, the situation is that the plaintiff has kicked up enough dust that I cannot confidently conclude that the plaintiff's race harassment claim should be rejected, particularly since the facts and the inferences therefrom are to be viewed in his favor.

   B. On the other hand, the plaintiff has indiscriminately alleged a myriad of allegations in support of this claim which, to the extent that they can be considered harassment, lack any racial connotation. See Baldwin v. Blue Cross/Blue Shield of Alabama, supra, 480 F.3d at 1301-02 (Title VII "does not prohibit harassment alone, however severe and pervasive. Instead, Title VII prohibits ... harassment that discriminates based on a protected category such as [race]."). Accordingly, in order to streamline the trial, and avoid jury confusion and prejudice, the following allegations should be

excluded at trial pursuant to Rule 56(d)(1), F.R.Civ.P., because the plaintiff

has failed to show they are racially motivated:

1.  "Weight Belt" (Doc. 59, p. 6).[27]

2.  "Working above Job Description as Level II
    with no Pay Increase" (Doc. 59, pp. 2-3).[28]

3.  "Vandalism to [the plaintiff's] Personal
    Vehicle" (Doc. 59, p. 1).[29]

---

[27]The plaintiff wanted a weight belt without shoulder straps, and he received one with shoulder straps  (Doc. 18, pp. 234-35). To the extent that this circumstance could even be considered harassment, there is no racial connotation to this conduct and the plaintiff has not presented any probative evidence that his race played any role in the selection of this weight belt. To the contrary, the same type of belt was purchased for a white employee that day. Therefore, it should not be considered as part of a hostile work environment claim. See Washington v. The Kroger Co., 2007 WL 433519 at *3 (11th Cir. 2007)(unpub. dec.)(quoting Gupta v. Florida Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2007)(conduct "that do[es] not relate to the [race] of the ... offended party ... [is] not counted" in determining the existence of a hostile working environment)).

[28]As a matter of law (and common sense), this cannot reasonably be considered harassment because, according to the plaintiff, level II work is easier and less laborious (Doc. 16, p. 61; Doc. 18, p. 257). Further, the plaintiff has not identified any employee, black or white, who has received differential pay, even though white and black employees regularly work outside of their job descriptions (Doc. 17, p. 162; Doc. 18, pp. 230, 232-33).

[29]This contention is patently frivolous, as the plaintiff does not know the circumstances under which his car was scratched, or who did it (Doc. 17, pp. 167, 174, 178). Thus, there is no evidence that the damage was intentional, let alone racially motivated.  See Laosebikan v. Coca-Cola Co., 2006 WL 224167 at *5 (11th Cir. 2006)(unpub. dec.)(in prosecuting a racial harassment claim, the plaintiff is obligated to "present concrete evidence in the form of specific facts, not just conclusory allegations and assertions.").

4.   "Huffman refuses to allow Baker to Return to
     Work Upon Release" (Doc. 59, p. 6).[30]

5.   "Huffman tells Plummer that Baker calls her
     one of the 'Bitches in the Office.'" (Doc. 59,
     p. 6).[31]

The plaintiff also alleges, under the rubric of racial harassment,

conduct or statements of co-employees. In addition to lacking evidence of a

racial connection, the plaintiff has not identified any basis for attributing Title

VII liability to an employer for this conduct:

6.   "Goss and Byrd call Baker a 'troublemaker'"
     (Doc. 59, p. 4).[32]

---

[30]The unrefuted testimony is that Huffman was not authorized to allow the plaintiff
to return to work until he received permission from Cropsey, and he had not received that
authorization when the plaintiff attempted to return to work on January 21, 2005. The
plaintiff's belief that he should have been permitted to return to work because his doctor
released him to work (Doc. 18, pp. 203-04), does not undermine Huffman's legitimate,
nondiscriminatory reason for directing the plaintiff to leave the workplace on January 21,
2005 (Doc. 14-2, ¶38; Doc. 21, pp. 40-41). See Bald Mountain Park, Ltd. v. Oliver, 863
F.2d 1560, 1563 (11th Cir. 1989)("Mere conclusions and unsupported factual allegations
are legally insufficient to create a dispute to defeat summary judgment."). Therefore, a
factfinder could not reasonably conclude that this circumstance was harassment, or racially
motivated.

[31]Sue Plummer, an office worker, testified that Huffman had told her on one
occasion that the plaintiff referred to her and another office worker as "the bitches in the
office" (Doc. 35, pp. 32-34). The plaintiff has not shown that this was racially motivated
or how it contributed to the plaintiff's experience of a racially hostile work environment.

[32]This comment has no racial connotation, and the plaintiff has not presented any
evidence that it is related to his race. See Washington v. The Kroger Co., supra, 2007 WL

7.   "Boggs 'hates' Baker" (Doc. 59, p. 4).[33]

8.   "Goss–Accusations Against Baker in Break-room" (Doc. 59, pp. 5-6).[34]

---------------

433519 at *3 ("the statements and conduct must be of a [racial] nature ... before they are considered in determining whether the severe or pervasive requirement is met."). Rather, a co-worker's dislike of another employee falls squarely in the category of the "ordinary tribulations of the workplace." Faragher v. City of Boca Raton, supra, 524 U.S. at 788. Further, the plaintiff has not shown that he was aware of this comment prior to the litigation. See Abbes v. Embraer Services, Inc., supra, 2006 WL 2613753 at *4.

[33]This is just another example of a co-worker's dislike of an employee.

[34]It is the plaintiff's position that Goss falsely accused the plaintiff of threatening to "fuck" him up. Assuming this is true, the plaintiff has not identified the theory under which the defendant would be liable for a co-worker's false statements to his employer and the police.

To the extent this vague contention pertains to the plaintiff's dissatisfaction with the defendant's investigation of Goss's accusations, the defendant conducted a reasonable investigation and there is no evidence that the defendant's decision to place the plaintiff on administrative leave for a fitness-for-duty evaluation was racially motivated. See Cooper v. Southern Co., 390 F.3d 695, 740 (11th Cir. 2004), cert. denied, 546 U.S. 960 (2005)(the relevant issue is not whether the plaintiff engaged in the misconduct that he is accused of, but whether the employer honestly believed he engaged in that conduct); see also Laosebikan v. Coca-Cola Co., supra, 2006 WL 224167 (11th Cir. 2006).

Notably, the plaintiff's complaint about the fitness-for-duty evaluation appears to be the only allegation swirling around in the plaintiff's responsive memorandum that was not included on the plaintiff's court-ordered list. It would not surprise me if the contention simply got lost in the pile of allegations. Regardless, it was not included in the list, and pursuant to the Order, it is properly deemed abandoned. It is appropriate to add that the psychological evaluation was eminently reasonable since the defendant was presented with circumstances that could potentially result in a disaster. However, although evidence of the circumstances concerning the psychological evaluation should be excluded at trial, results of the psychological evaluation may be relevant to the plaintiff's subjective perception of a hostile work environment.

9.    "Burke, Boggs and Goss refuse to work with Baker" (Doc. 59, pp. 8-9).[35]

10.   "Goss 'keeping track' of Baker's time card" (Doc. 59, p. 9).[36]

11.   "Boggs-Accusation Against Baker in Convenience Store" (Doc. 59, p. 8).[37]

For these reasons, the plaintiff should be permitted to proceed to trial on his race harassment claim. However, in order to avoid a waste of time and confusion, the evidence that he is permitted to present in support of this claim should be limited as discussed above in order to exclude extensive irrelevant testimony.

---

[35]A co-worker's personal dislike for another co-worker is an ordinary tribulation of the workplace that is not actionable. See Faragher v. City of Boca Raton, supra.

[36]The plaintiff has not shown that Goss looking at his time card on one occasion has any connection to his race, or how that conduct contributed to a racially hostile work environment. See Laosebikan v. Coca-Cola Co., supra, 2006 WL 224167 (rejecting claim that a time card being "tracked" is evidence of a racially hostile work environment because it was entirely devoid of racial content).

[37]The plaintiff alleges that Boggs falsely accused him of making monkey noises during a work break at a convenience store. The plaintiff has not identified the theory under which the defendant would be liable for a co-worker's false report to his employer. Further, the plaintiff has not shown that the failure to discipline anyone for this incident was racial harassment, as it was an insignificant dispute that did not even take place in the workplace or during work hours (see Doc. 20, pp. 67-68). See Bald Mountain Park, Ltd. v. Oliver, supra, 863 F.2d at 1563 ("Mere conclusions and unsupported factual allegations are legally insufficient to create a dispute to defeat summary judgment.").

VII.

Title VII also makes unlawful retaliation against an employee for complaining about discrimination. 42 U.S.C. §2000e-3(a); Fla. Stat. §760.10(7).   An employee need not prove the underlying claim of discrimination for the retaliation claim to succeed.   Sullivan v. Nat'l R.R. Passenger Corp., 170 F.3d 1056, 1058-59 (11th Cir. 1999), cert. denied, 528 U.S. 966 (1999).

The plaintiff has not presented any direct evidence of retaliation. Rather, he proceeded with his claim using the framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), which applies to retaliation claims. Johnson v. Booker T. Washington Broadcasting Serv., Inc., 234 F.3d 501, 511 n. 10 (11th Cir. 2000).

In order to establish a prima facie case of retaliation, a plaintiff must prove the following elements: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision. Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 978, n. 52 (11th Cir. 2008). The causal link element is construed so

broadly that a plaintiff merely has to prove that the protected activity and the adverse action are not completely unrelated.  Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004).  This requires a showing that the decisionmaker was aware of the protected conduct and that there was close temporal proximity between the protected conduct and the adverse action.  Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999).  The burden then shifts to the defendant to rebut the presumption of retaliation by producing a legitimate reason for the adverse employment action.  Id.  The presumption of retaliation then drops from the case and it is the plaintiff's burden to prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for retaliation.  Id.

The plaintiff asserts that he engaged in protected activity when he submitted grievances to his employer in September 2003 and January 2004, and when he filed his charge of discrimination on December 8, 2004 (Doc. 59, pp. 11-12).  The plaintiff alleges that Huffman retaliated against him for this protected activity by refusing to make eye contact with him or tell him work assignments (id., p. 12).  This contention purports to be supported by the testimony of the plaintiff's colleagues, who state that a co-worker, instead of

-59-

Huffman, told the plaintiff his daily work assignments (Doc. 25, pp. 47-48;
Doc. 36, pp. 13-14). Further, co-worker Lewis stated that he "notic[ed] that
[Huffman] wouldn't make eye contact with" the plaintiff (Doc. 36, p. 13).

These circumstances do not constitute an adverse employment
action. A plaintiff alleging retaliation has suffered an adverse employment
action if "a reasonable employee would have found the challenged action
materially adverse, which in this context means it well might have dissuaded
a reasonable worker from making or supporting a charge of discrimination."
Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)
(internal quotation marks omitted). Although this provision encompasses
more than "acts that affect the terms and conditions of employment," it
"protects an individual not from all retaliation, but from retaliation that
produces an injury or harm." Id. at 67. The requirement of a material
adversity is meant to distinguish significant from trivial harms. Id. at 68.
Thus, petty slights, minor annoyances, and lack of good manners are not
covered. Id. Moreover, neither are personality conflicts that generate
antipathy and snubbing by supervisors and co-workers. Id.

Huffman's failure to make eye contact with the plaintiff and having another employee tell the plaintiff his work assignments is not conduct that would have dissuaded a reasonable worker from making or supporting a bona fide charge of racial discrimination. Rather, such "snubbing" falls squarely within the category of non-actionable trivial harms. See id. Underscoring the insignificance of this contention is the fact that it is based on the observations of other employees; it is not mentioned by the plaintiff in his deposition. Accordingly, this contention is not actionable.

The plaintiff also alleges Huffman retaliated against him by giving him low scores on his 2003-04 and 2004-05 performance appraisals, which were conducted in February 2004 and 2005, respectively (Doc. 59, p. 11). The plaintiff alleges that these lower evaluations resulted in smaller annual wage increases.

Annual wage increases are determined by the number of points received on an evaluation (see Doc. 14-9, pp. 7-8). In this regard, the plaintiff has typically been awarded a 4.5% annual merit increase based on a total of 50-54 points out of 60 possible points on his evaluations (see id., pp. 1-23). The plaintiff's highest evaluation was received for the 2002-03 period, during

-61-

which he had none of his characteristic attendance problems and he was lauded for an extraordinary work effort on a lift station project (id., pp. 15-16). He received a total of 56 points and a merit increase of 5% (id.).

The plaintiff argues that he was given lower scores on his performance evaluations for 2003-04 and 2004-05, as compared to his 2002-03 performance evaluation, in retaliation for complaining about discrimination (see Doc. 17, p. 138). The plaintiff's 2002-03 evaluation score reflects extraordinary performance and attendance that has not been repeated. Therefore, his subsequent scores should not be compared with that evaluation. Rather, the plaintiff's evaluations reflect overall that his performance typically warrants a score of 50-54 points and a merit increase of 4.5%. Moreover, as the defendant persuasively shows, because of the plaintiff's reduced attendance score on his 2003-04 evaluation – which is not in dispute – he could not have received a score that would have resulted in a merit increase greater than 4.5% (Doc. 53, pp. 4-5). Consequently, the plaintiff does not have an actionable claim regarding his 2003-04 evaluation, as he received for that period a typical score of 50 points and a pay increase of 4.5%.

However, for the 2004-05 evaluation, the plaintiff received 46 points, resulting in an hourly wage increase of 4%; .5% lower than his typical pay increase of 4.5% (see Doc. 14-9, pp. 7-8). In this regard, the plaintiff alleges that he inexplicably received lower scores in categories such as job knowledge, work habits, initiative, and teamwork (Doc. 30, p. 13; Doc. 19, pp. 131, 135-36, 138, 142).

The defendant did not meaningfully address the plaintiff's complaints about the lower scores. Rather, the defendant summarily argues that the "[p]laintiff's performance evaluations ... [for these years] were largely in line with previous evaluations" and notes that the plaintiff's poor attendance those years accounts for a significant loss of points (Doc. 15, pp. 19-20; p. 25, n. 11). However, the evaluation score of 46 is lower than any other score the plaintiff has received and is attributable to lower scores in categories other than attendance. Further, this low score was the difference between a 4% and 4.5% raise.

Moreover, there is arguably a causal connection between the protected activity and the low evaluation score. Thus, although it is on the cusp of what is considered close temporal proximity, when the timing is

considered collectively with the unexplained lower scores and Huffman's comments that the plaintiff is a troublemaker and that his EEOC charge was a "disruption" (Doc. 21, pp. 42, 48-50; Doc. 36, p. 39), there is arguably sufficient evidence from which a factfinder could reasonably conclude that the lower scores were retaliatory.  See Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1291 (11th Cir. 2000)("gaps of time, standing alone, do not preclude a plaintiff from producing enough evidence for a reasonable jury to conclude that protected speech was a substantial factor" in the adverse employment decision).

The defendant also argues that this allegation is not actionable because the denial of a .5% increase would amount to a de minimus five cents per hour (Doc. 53, p. 5, n.13).  However, the defendant has not provided any legal authority holding that the loss of roughly $100 annually is, as a matter of law, so inconsequential that it does not constitute an adverse employment action.

The Eleventh Circuit has said that "the denial of a pay raise of any significance clearly affects an employee's compensation and ... constitutes an adverse job action."  Crawford v. Carroll, 529 F.3d 961, 971 (11th Cir.

2008).[38] Moreover, in the retaliation context, the pertinent issue is whether the loss "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 974 (quoting Burlington Northern & Santa Fe Ry. Co. v. White, supra). I am not prepared to state that the loss of $100 annually is insignificant, or that it would not dissuade a reasonable person in the plaintiff's position from filing a charge of discrimination.

Accordingly, viewing the evidence in the light most favorable to the plaintiff, the defendant has not adequately refuted at this point the plaintiff's contention that Huffman retaliated against him for engaging in protected activity by giving him lower scores on his 2004-05 performance evaluation. See Hairston v. Gainesville Sun Pub. Co., 9 F.3d 913, 921 (11th Cir. 1993). Therefore, I recommend that the retaliation claim be allowed to proceed to trial on that contention. However, the defendant is entitled to summary judgment on the retaliation claim to the extent it is based upon the 2003-04 evaluation, or Huffman's alleged failure to make eye contact or give work assignments.

---

[38]In Crawford, the plaintiff was retroactively awarded a pay increase, and the Eleventh Circuit found that the temporary denial of a merit pay increase was an adverse employment action for the purposes of a retaliation claim.

## VIII.

Finally, the defendant seeks summary judgment on the plaintiff's claim that its conduct violated 42 U.S.C. 1981. The Eleventh Circuit held in Butts v. County of Volusia, 222 F.3d 891 (11th Cir. 2000), that §1981 does not provide a cause of action against state actors.[39] The plaintiff does not dispute this legal authority. Consequently, it is appropriate to grant summary judgment in the defendant's favor on the plaintiff's §1981 claim.

## IX.

In conclusion, for the reasons stated above, I recommend that the defendant be granted summary judgment in its favor on the plaintiff's 42 U.S.C. 1981 claim and his contention of race discrimination based on disparate treatment. Further, I recommend that the motion be denied as to the plaintiff's race harassment claim. With respect to the retaliation claim, I recommend that the motion be granted except as to the contention concerning the 2004-05 evaluation.

---

[39]The plaintiff concedes that a §1981 claim is not actionable against a municipality (Doc. 30). The plaintiff filed a motion to amend the complaint to substitute the §1981 claim with a §1983 claim, but that motion was denied because the plaintiff failed to show good cause for the amendment at such a late date (Doc. 52).

Respectfully submitted,

THOMAS  G.  WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: AUGUST 22, 2008

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. 636(b)(1).